**LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOHN S. POULOS, SB# 154689
   E-Mail: John.Poulos@lewisbrisbois.com
2020 West El Camino Avenue, Suite 700
Sacramento, CA 95833
Telephone:  916.564.5400
Facsimile:  916.564.5444

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
KATHERINE C. DEN BLEYKER, SB# 257187
   E-Mail: Katherine.DenBleyker@lewisbrisbois.com
OMAR M. ANIFF, SB# 315446
   E-Mail: Omar.Aniff@lewisbrisbois.com
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Telephone: 213.250.1800
Facsimile: 213.250.7900

Attorneys for HALIBURTON
INTERNATIONAL FOODS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| HALIBURTON INTERNATIONAL FOODS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RICHARD MARASCO, an individual; SEVILLO FINE FOODS, Inc., a Utah Corporation, and DOES 1-25, inclusive. <br><br> Defendant. | CASE NO.  5:20-CV-01069-JGB (SHKx) <br><br> **FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL:** <br><br> **1.** Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq.; <br> **2.** Misappropriation of Trade Secrets in Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426 et seq.; <br> **3.** Breach of Contract; <br> **4.** Intentional Interference with Contractual Relations; <br> **5.** Intentional Interference with Prospective Economic Relationship; <br> **6.** Breach of Fiduciary Duty and Duty of Loyalty; <br> **7.** Breach of Fiduciary Duty and Duty of Care |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4840-5014-1642.2

1

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL

Plaintiff HALIBURTON INTERIONAL FOODS, INC. ("HIF"), by and through its undersigned counsel, hereby bring this Complaint for preliminary and permanent injunctive relief, declaratory relief, and damages against Defendants RICHARD MARASCO, SEVILLO FINE FOODS, INC., and DOES 1-25 (collectively as "Defendants") and, in support thereof, aver as follows:

## I.    THE PARTIES

1.    Plaintiff HIF is a corporation organized and existing under the laws of the state of California, maintaining its principal place of business in Ontario, California.

2.    Plaintiff is informed and believes, and on that basis alleges, that Defendant Richard Marasco ("Defendant Marasco") is an individual residing in Ogden Valley, Utah.  Defendant Marasco was employed by HIF from 2010 to November 19, 2020.  Prior to his departure from HIF, Defendant Marasco was the Executive Vice President.  Plaintiff is informed and believes, and on that basis alleges, that Defendant Marasco is currently serving as a Director on the Board of Directors of Defendant Sevillo Fine Foods, Inc.

3.    Plaintiff is informed and believes, and on that basis alleges, that Defendant Sevillo Fine Foods, Inc. ("Defendant Sevillo") is a corporation organized and existing under the laws of the state of Utah, maintaining its principal place of business in Midwale, Utah.

4.    Plaintiff is informed and believes, and on that basis alleges, that Does 1-25 are Defendant Sevillo's directors, officers, and employees who reside in Utah.

## II.    JURISDICTION AND VENUE

5.    The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 because this action involves claims asserted pursuant to the federal Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*).

6.    The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 to consider Plaintiff's claims under California common law, the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL

1  California Uniform Trade Secret Act, and other California statutes.

2       7.    The Court has personal jurisdiction over Defendants pursuant to Fed.

3  R. Civ. P. § 4(k)(1)(A) as Defendants all have minimal contacts with the State of

4  California such that summons to this Court would not offend due process and

5  notions of fair play.  (*International Shoe v. Washington*, 326 U.S. 310 (1945).)

6  Defendant Marasco has directed his tortious conduct towards HIF, a California

7  corporation, and damage to Plaintiff has occurred in California.  Further, Defendant

8  Marasco acquired his knowledge of HIF's trade secrets during his tenure at HIF in

9  California.  Second, Plaintiff is informed and believes, and on that basis alleges that

10  Defendant Sevillo and Does 1-25 routinely and continuously direct their actions

11  towards the forum state in furtherance of Defendant Sevillo, including, but not

12  limited to, contracting with California-based vendors and customers.  Further,

13  Defendant Sevillo operates an office in Tiburon, California.

14       8.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)

15  because Plaintiff HIF is a California corporation with its principal place of business

16  in this judicial district and a substantial part of the events or omissions giving rise to

17  the claims occurred here.

18                    **III.    FACTUAL ALLEGATIONS**

19                         **Summary of the Facts**

20       9.    Established in 1992, HIF has been on the forefront of large-scale food

21  production and boasts a large and diverse product line.  For nearly 30 years, HIF has

22  been providing its products and services to the country's largest multi-unit

23  restaurant operators and restaurant groups.

24       10.    HIF's owner and president, Ian Schenkel ("Mr. Schenkel") is a highly

25  regarded engineer and industry leader in food manufacturing and process design.

26  His innovative ideas have led to the development of many proprietary processes and

27  unique custom machinery that differentiate HIF from the industry.  These processes

28  and machine design details have led to the development of several hundred new

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  food products as well as cost saving manufacturing methods that give HIF a unique
2  advantage.

3      11.    HIF creates unique and exclusive products for specific multi-unit
4  restaurant operators and restaurant groups that are not available to the rest of the
5  food industry.  Defendant Marasco had knowledge of these items, how they are
6  manufactured, and which of HIF's customers they have been developed for.

7      12.    Over the years, HIF has established many customers, clients, and
8  vendors, and has developed relationships with these entities that have allowed HIF
9  to become the leader in its sphere.

10     13.    Defendant Marasco joined HIF in 2010 as the Culinary Director of the
11  company.  As a condition of his employment, he signed provisions of HIF's
12  employee handbook regarding HIF's confidential and proprietary trade secrets
13  policy.  A true and correct copy of the Defendant Marasco's signed confidentiality
14  and non-disclosure agreements are attached as Exhibit A.  In so doing, he expressly
15  acknowledged the policy and agreed to keep secret HIF's trade secrets and
16  confidential information.  Further, as part of these agreements, Defendant Marasco
17  agreed that for a period of one year after his decision to leave HIF or termination of
18  said employment, he was not to solicit business from any account or client which is
19  serviced by or is a client of HIF.  Defendant Marasco also signed a Handbook
20  Acknowledgement Receipt form, acknowledging his receipt and understanding of
21  the employee handbook, which contained nearly identical confidentiality and trade
22  secret language.  And again on or around September 26, 2017, Defendant Marasco
23  signed a revised version of the confidential and proprietary trade secrets agreement,
24  as well as an additional confidentiality agreement.

25     14.    Defendant Marasco eventually worked his way up HIF's organization
26  to become its Executive Vice President.  As Executive Vice President and
27  functionally the second-in-command, Defendant Marasco was directly involved in
28  managing and running HIF.  As the head of many departments, Defendant Marasco

4

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  was necessarily privy to confidential and proprietary trade secrets ranging from

2  HIF's carefully curated and vetted vendor and client lists, confidential formulas,

3  proprietary technology and processes, confidential pricing information, marketing

4  and development plans, amongst other confidential information.

5        15.    In or around January 2018, HIF's owner and president, Mr. Schenkel

6  took a leave of sabbatical and tasked Defendant Marasco with managing the entire

7  company.  During Mr. Schenkel's year and a half sabbatical, Defendant Marasco

8  completely mismanaged HIF resulting in at least five million dollars in losses.

9  During this time, Defendant Marasco failed to manage production costs by

10 underproducing and keeping the labor force arbitrarily high.  He also failed to

11 implement the costing module of HIF's new enterprise management software.

12 Instead, under his leadership, arbitrary and exaggerated unit cost data was inputted

13 into the new system.  As a result, under his leadership, HIF was overbidding on

14 contracts, which resulted in a loss of business and customer goodwill.

15        16.    After Mr. Schenkel returned from his sabbatical, Defendant Marasco

16 demanded that he be made permanent president of HIF.  After Mr. Schenkel rejected

17 his proposition, Defendant Marasco attempted to take over HIF by trying to

18 organize the management against Mr. Schenkel and making numerous false

19 representations.  Defendant Marasco also postured that he was going to perform a

20 hostile takeover of HIF with numerous investors and millions of dollars in

21 financing.

22        17.    However, on or around November 19, 2019, Defendant Marasco

23 announced he was resigning from HIF.  After failed attempts to retain Defendant

24 Marasco, he was taken off of HIF's payroll on or around January 28, 2020.  In

25 February 2020, Mr. Schenkel was informed by Haliburton's largest customer that

26 Defendant Marasco was working for another vegetable company and that they were

27 soliciting HIF's vegetable business currently.

28        18.    Defendant Marasco joined Defendant Sevillo Fine Foods.  It is unclear

5

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  at what date Defendant Marasco joined Sevillo Fine Foods.  Defendant Sevillo Fine

2  Foods is a food manufacturer, manufacturing "Slow Roasted Tomatoes & Artisan

3  Vegetables."

4      19.    Shortly thereafter, on March 20, 2020, HIF was informed by one of its

5  exclusive large-volume vendors that Mary Hessessey, the Business Development

6  Manager of Defendant Sevillo, had called and emailed the vendor in an attempt to

7  contract for the exact amount and identical specification of a particular raw

8  ingredient that HIF orders for one of HIF's own, proprietary products, which is sold

9  to HIF's single largest customer.  Defendant Marasco had access to this information

10 while employed at HIF.  When asked how Defendant Sevillo knew of the vendor,

11 the buyer was mysteriously vague and coy about the details.  The fact that a

12 "Business Development Manager" called rather than a purchasing person raised a

13 red flag for HIF's vendor, who immediately alerted HIF.

14     20.    Based upon the foregoing, and since a direct competitor of HIF

15 ordering the exact amount and specification of this raw ingredient from HIF's same

16 vendor would be highly unlikely—if not impossible—but for misappropriation of its

17 trade secrets, HIF is informed and believes that Defendant Marasco has breached his

18 non-disclosure agreement and misappropriated HIF's trade secrets.  HIF is also

19 informed and believes that due to Defendant Sevillo and Does 1-25 knowledge that

20 such confidential and proprietary information constituted trade secrets, their use of

21 this information also constituted misappropriation of trade secrets as well.

22     21.    Further, on or around August 13, 2020, HIF was informed by this same

23 customer Defendants were targeting, that Defendant Sevillo had acquired half of the

24 customer's pickled red onion contract and adobo roasted corn and black bean

25 contract, which were previously exclusive to HIF.  Moreover, the customer's

26 relevant Requests for Proposals ("RFP") were not specific enough to allow a

27 bidding party or competitor to reverse engineer HIF's pickling recipe and adobo

28 seasoning blend as necessary to make equivalent products and win the RFP.

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,
DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    Defendant Sevillo was only able capture HIF's pickled red onion and adobo roasted

2    corn and black bean manufacturing business by stealing its pickling formula and its

3    adobo seasoning.

4                    **HIF's Business and Trade Secrets**

5          22.    HIF is one of the leaders in large-scale food manufacturing, and is

6    based in Ontario, California.  HIF specializes in producing food solutions and

7    products that are integrated and used by multi-restaurant operators and restaurant

8    corporations throughout the country.  HIF's extensive product line is diverse and

9    includes fire-roasted vegetables and fruits, pickled-vegetables, sauces, salsas, and

10   soups, amongst other products.

11         23.    HIF was founded in 1992 by the owner and Chief Executive Officer,

12   Ian Schenkel ("Mr. Schenkel.").  Through his hard work, investment in the

13   company, and dedication to the trade, Mr. Schenkel has turned HIF into the nation's

14   premier large-scale food manufacturer.  HIF routinely contracts with nationally-

15   recognized restaurant companies to produce millions of pounds of food for its

16   clients.  HIF on average produces about one million pounds of food each day at its

17   state-of-the-art food manufacturing facility.

18         24.    HIF's ability to offer high-quality and varied food products throughout

19   the year at competitive prices is due to HIF's expertise, skill, innovation, and the

20   strategic relationships and partnerships it has forged in the industry with vendors

21   and customers.

22         25.    In the nearly thirty years it has been in business, HIF has developed

23   strategic relationships and partnerships with vendors for the steady supply of

24   ingredients it needs to be able to offer its clients the best products available.  HIF

25   has invested its time, money, and resources in establishing and cultivating these

26   strategic relationships.  HIF routinely works with its vendor partners to advance

27   quality and food safety initiatives, improve processes and yields to control costs and

28   advance quality.  This often includes visiting vendor sites, working directly with the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,
DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL

vendor's production/sourcing teams, and purchasing new equipment for the vendor to allow it to meet HIF's exacting formula and specifications.   And in return, these relationships have led to HIF having year-round access to exclusive supply chains of difficult to source ingredients in the quantities it needs at favorable and exclusive rates.  This consistent and reliable source of raw ingredients has allowed HIF to offer the products and solutions its customers want and has allowed it to supply the nation's restaurants all year.  This has allowed HIF to grow in market share and increase its goodwill with both its vendors and clients.  As such, a large part of HIF's competitive advantage is derived from its vendor relationships, including the identity of such vendors, vendor contacts, knowledge of its vendor pricing, and order specifications.

26.    HIF's competitive advantage is further derived from its relationships with its clients.  HIF has invested hundreds of millions of dollars in its technology, infrastructure, quality and food safety systems, and its workforce to enable it to provide the solutions and products its clients want and need.  Additionally, HIF has expended a great deal of time, money, and effort identifying, cultivating, and servicing the needs of its clients and prospective clients.  Through the years, HIF has garnered its clients' goodwill and has been able to negotiate contracts at exclusive and extremely favorable rates to HIF.  These confidential, bargained-for rates have allowed HIF to secure contracts where its competitors have not and has allowed HIF to grow and lead the industry.

27.    HIF has compiled and maintains all of these contracts, vendor/client identities, client/vendor contacts, order histories, specifications, preferences, and pricing, amongst other data, in its enterprise database.  In addition to this confidential data, HIF's confidential and proprietary trade secrets include all other information that is not known by its competitors or within the food manufacturing business generally, and from which HIF derives substantial competitive value from this information not being known.  This includes, but is not limited to: the criteria

8

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

and formulas used by the HIF in pricing its products and services; HIF product recipes and formulas, and their manufacturing processes, procedures, and specifications; the research and development of products; the pricing of special packages that HIF has negotiated; customer lists and the composition and organizations of these accounts' businesses; sensitive details concerning the structure, conditions, and extent of their existing productions and services; product portfolio and services; service arrangements and other data showing the particularized requirements; HIF's business roadmaps; and preferences of HIF accounts.

28.    The above identified categories of confidential information, specifically, but not limited to, HIF's customer and vendor lists, including specific information which would otherwise be unknown to Defendant Sevillo through traditional means; HIF's proprietary product formulas, specifications, and manufacturing processes; and Plaintiff's business roadmaps, amongst other confidential and proprietary information, constitute HIF's trade secrets ("Trade Secrets").

29.    HIF derives substantial benefit from maintaining the confidentiality of its Trade Secrets.  Disclosure and use of these Trade Secrets by parties other than HIF would undoubtedly cause irreparable harm to HIF.

30.    HIF Trade Secrets, all of which are products of substantial time and expense, are not generally known to the public.  HIF Trade Secrets are not readily ascertainable in HIF's industry, in any type of trade or public directory, or any other publicly available source.

31.    HIF's Trade Secrets would (and do) have substantial value if acquired by any competitor, including Defendant Sevillo, as these Trade Secrets would allow a competitor (and have allowed Defendants) readily to:  (a) target HIF's cherry-picked and vetted vendors, (b) inform itself of the specific person(s) to contact at the HIF's vendors, (c) inform itself of the vendor's preferences and HIF's order

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

histories including which ingredients it orders, the quantities it orders, and exact specifications of such ingredients; (d) inform itself of HIF's negotiated vendor rates; and (e) inform itself of HIF's pricing to undercut HIF's contracts and interfere with HIF's ability to purchase ingredients critical to its business.

32.   Similarly, competitors could gain analogous client-related data which it could use to undercut HIF's current contracts or unfairly outcompete HIF for future contracts by improperly using HIF's data to offer their products at lower prices or in larger quantities to exclude HIF's share of the relevant business opportunity.  In fact, upon information and belief, Defendant Sevillo has used this Trade Secret information to usurp Plaintiff's customers already and has used this information to force HIF to drastically reduce its margins to retain its other customers.

33.   Further, competitors could use HIF's product formulas, specifications, and processes and procedures, to create new products that directly compete with HIF without having to invest in any research and development, which Defendant Sevillo has done.

34.   Additionally, HIF is informed and believes and on that basis alleges that its Trade Secrets would also (and do) have substantial value as a business roadmap if acquired by any competitor, as the Trade Secrets would allow a competitor (and have allowed Defendant Sevillo) to: (a) inform itself of, and allow it to take advantage of HIF's business targets, development and extension plans and goals; (b) glean and discern other confidential financial data; and (c) otherwise allow the competitor to profit from HIF's extensive time and effort investment to establish and grow its business.

35.   Moreover, in the highly-competitive large-scale food production industry in which HIF operates, the pool of potential vendors who can supply the ingredients and supplies in the quantities, to the specifications it requires, and at the prices necessary for HIF to meet the demands of its clients is small and exclusive. Any interference or disruption of its vendor relationships will necessarily cause a

10

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  ripple effect through HIF's entire business operation and will cause it to lose the

2  hard-earned goodwill it has with its clients.

3      36.    Similarly, being a large-scale food producer that must produce

4  hundreds of thousand pounds of food per day in order to remain profitable, HIF's

5  client base is also very limited to multi-restaurant operators and large restaurant

6  corporations who have a need for such volume.  As such, the pool of HIF's clients is

7  also limited to a relatively few institutional clients who contract with HIF for their

8  specific product needs.  Any disruption to HIF's client relations will necessarily

9  have a domino-effect on HIF's business and its ability to continue to operate.

10     37.    HIF spends millions of dollars each year on the development of new

11  products, formulas, new processing methods, and innovative process development.

12  Mr. Schenkel is a mechanical engineer and has developed most of the proprietary

13  process technology that created many of the unique products that HIF manufactures.

14  These unique processes, machinery, and knowledge have created products that are

15  exclusive to HIF, and as such, HIF is the market leader in many of these product

16  categories.

17     38.    Through the use of cutting edge technologies and proprietary ingredient

18  and product specifications, HIF has cultivated and developed an exclusive supplier

19  list that uses its proprietary technology, equipment, and food specifications (subject

20  to confidentiality agreements) to deliver ingredients and products exclusive to HIF.

21  Similarly, by using its exclusive suppliers who have built their operations around

22  HIF, it has been able to control its quality and margins to allow HIF to win and

23  maintain customer contracts worth millions of dollars.  By the same token, HIF's

24  customers have come to expect the quality of HIF products, which is ensured by

25  HIF retaining its exclusive access to its vetted vendors.

26     39.    As such, HIF's Trade Secrets are valuable to HIF and their value lies

27  primarily in being kept secret and not generally know.  For that reason, HIF has

28  taken and continues to take, careful, substantial, and reasonable steps to safeguard

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

11

the secrecy of its Trade Secrets.

40.    First, HIF instructs its employees on the various forms of confidential and proprietary trade secret information through its handbook, which contains the following:

> During your employment by Haliburton International Foods, Inc., you may have access to confidential and proprietary data which is not known by competitors or within the food manufacturing business generally. This information (hereinafter referred to as "Confidential Information") includes, but is not limited to, data relating to the Company's marketing and servicing programs, procedures and techniques; the criteria and formulae used by the Company in pricing its products and services; recipes, development of products and research, the structure and pricing of special packages that the Company has negotiated; lists of customers and prospects; the identity, authority, and responsibilities of key contacts at Company accounts; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; sensitive details concerning the structure, conditions, and extent of their existing products and services; contract expiration dates; commission rates; service arrangements; proprietary software, Web applications and analysis tools; and other data showing the particularized requirements and preferences of the accounts. This Confidential Information constitutes a valuable asset of the Company, developed over a long period of time and at substantial expense.

Defendant Marasco signed a handbook acknowledgment stating that he received and understood the handbook, which included the above language.

41.    Further, evidencing how important HIF's confidential Trade Secrets are to its business, HIF requires that employees sign confidentiality and non-disclosure agreements promising to keep such information secret and to refrain from using the information for non-HIF purposes.  See Ex. A.  Defendant Marasco signed these agreements when he was first hired and again on September 26, 2017.

42.    In addition to requiring employees sign these agreements, HIF also takes other reasonable means to keep its secrets safe, including but not limited to: (a) securing the sensitive areas of HIF's business site through the use of security and security-badged entrances; (b) providing employees access to its database on a need

12

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

to know basis and ensuring only authorized access by requiring individualized login credentials; (c) requiring, as a condition of employment, that all employees promise not to use or disclose this information, except in the performance of their duties for HIF; (d) limiting access and/or restricting access to this information by employees and contractors/vendors on a need-to-know basis; (e) requiring security passwords to access HIF's databases, other electronic systems, networks, servers, and computers; (f) requiring Trade Secrets to be kept in secure locations when not in use; (g) requiring contracted parties who are provided access to HIF's Trade Secrets on a need-to-know basis to sign strict non-disclosure and confidentiality agreements imposing an obligation on such parties to protect such information from disclosure; and (h) issuing cease and desist letters to former employees, including to Defendant Marasco, suspected of misappropriating Trade Secrets and demanding the return of such information.

## DEFENDANT MARASCO'S CONTRACTUAL OBLIGATIONS

43.     Defendant Richard Marasco joined HIF in 2010 as the Culinary Director of the company.

44.     As a condition of his employment with HIF, Defendant Marasco signed an employment agreement with HIF that included provisions protecting HIF's Trade Secrets and other confidential information (the "Marasco Agreement'). Ex. A.

45.     By signing the Marasco Agreement, Defendant Marasco expressly agreed, acknowledged, and represented that as part of his acceptance of "employment with Haliburton International Corp. [sic] [he] must agree not to disclose any confidential, proprietary, or trade secret information of Haliburton International Corp."

46.     Defendant Marasco expressly agreed, acknowledged, and represented that he must: "(a) not use any such Confidential Information for [his] personal benefit or for the benefit of any person or entity other than the Company, and (b) use [his] best efforts to limit access to such Confidential Information to those who have

13

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

a need to know it for the business purposes of the Company.  In addition, you should minimize those occasions on which you take documents, computer disks, or a laptop containing such Confidential Information outside the office.  On those occasions where it is necessary, consistent with the best interests of the Company and doing your job effectively, to take documents, a computer disk, or a laptop containing Confidential Information outside the office, all appropriate precautionary and security measures should be taken to protect the confidentiality of the information."

47.    Further, Defendant Marasco expressly agreed, acknowledged, and represented that: "[he] agrees to continue to maintain the confidentiality of this information and not to directly or indirectly use or divulge, disclose or communicate such information to any person, firm, or corporation, even if their employment with Haliburton International Corp. terminates for any reason."  By signing the agreement, Defendant Marasco agreed not to disclose any Trade Secrets or other confidential information even after his employment with HIF terminated for any reason.

48.    The Marasco Agreement further states and Defendant Marasco expressly agreed, acknowledged, and represented that: "In the event that [he] is terminated or decides to leave Haliburton International Corp. [sic] for a period of one (1) year from the date of his [] termination or decision to leave, [he] agrees that [he] will not directly or indirectly solicit business, on behalf of [his] own business behalf or on the behalf of another partnership, corporation, or otherwise, from any account or client which was or is an account, which is serviced by or is a client of Haliburton International Corp. [sic] nor shall any employee interfere with, raid, or otherwise solicit employees of Haliburton International Corp. [sic] to leave their employment with said corporation  notwithstanding that Haliburton International Corp. [sic] may be the former employer of the employee."

49.    Moreover, by the terms of the Marasco Agreement, HIF retains sole ownership of confidential and Trade Secret information, including, but not limited

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

14

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL

to,:  all contracts, documents, files, customer account records, customer lists, product lists, supplier documentation and the like, affecting or relating to the business of the agency or its customers which the employee of the agency prepared, used, constructed, observed, possessed or controlled.  By signing the Marasco Agreement, Defendant Marasco agreed that: "After termination, [he is] not permitted to retain copies of any confidential document, data, or materials in any format."

50.     On or around September 26, 2017, Defendant Marasco again signed a broad confidentiality and non-disclosure agreement similar to the earlier Marasco Agreement, reaffirming yet again his fiduciary and contractual obligations to maintain the confidentiality of HIF's Trade Secrets.

51.     In agreeing and promising not to use HIF's Trade Secrets except in the performance of his duties for HIF, Defendant Marasco agreed he will not, directly or indirectly, use HIF's Trade Secrets to:  (i) identify former or current HIF clients or vendors for his personal benefit or the benefit of any other firm or entity; (ii) solicit or facilitate the solicitation of any former, current, or prospective clients or vendors of HIF of which Defendant Marasco came to know of through access to HIF's Trade Secrets during his employment with HIF, for his personal benefit or the benefit of any other firm or entity; and/or (iii) otherwise unfairly compete with HIF.

52.     Additionally, by signing the Marasco Agreement, Defendant Marasco agreed not to interfere with, raid, or otherwise solicit HIF employees within one year of the his separation from HIF.

### DEFENDANT MARASCO'S EMPLOYMENT WITH HIF

53.     Defendant Marasco worked at HIF in various capacities including Executive Vice President from 2010 until January 2020.

54.     In the approximately ten years of his employment with HIF, Defendant Marasco worked closely and directly with Mr. Schenkel .  As functionally second in command, Defendant Marasco was entrusted with large swaths of HIF's operation.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   Defendant Marasco oversaw many departments and functional groups, and thus was

2   required to have access to sensitive information including HIF's Trade Secrets.

3   Further, Defendant Marasco, in overseeing many critical HIF functions, learned the

4   inner workings of HIF's operations and gained invaluable experience in managing a

5   large-scale food manufacturing company.

6       55.    Starting in or around February 2017 through December 2017, HIF was

7   re-developing and restructuring its business in order to streamline production,

8   produce less food-waste, bring labor costs down, and net higher profits.  During this

9   period, HIF held daily production meetings between Defendant Marasco, other

10  executives, and various department managers.  These meetings were held to gather

11  information on the operation of HIF's plant processes, report the previous day's

12  output values, and identify key metrics that needed to improve and how to improve

13  them.  One of these critical metrics was the labor cost to production ratio.  Over the

14  course of many months and hundreds of meetings later, Defendant Marasco and HIF

15  executives arrived at the critical minimum daily production threshold required to

16  break even at varying labor costs.  This key figure was determined to be the bare

17  minimum amount of production required to offset the cost of labor and raw

18  ingredients each day.

19  **DEFENDANT MARASCO'S BRIEF TENURE AS DE FACTO PRESIDENT**

20      56.    In or around January 2018, Mr. Schenkel temporarily relinquished his

21  duties in order to spend some quality time with his family.  In his place, he gave

22  Defendant Marasco the opportunity to run the entire company as the de facto

23  president.

24      57.    In addition to running HIF, Defendant Marasco was given the crucial

25  task of selecting and implementing a new Product Lifecycle Management (PLM)

26  software to integrate with a the new enterprise management ("ERP") software that

27  HIF was developing and implementing.  This new PLM software was the operating

28  system and database where all of HIF formulas, quality metrics, vendor information,

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,
DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

specification, production data, costing and Trade Secrets in general would reside. Defendant Marasco selected the PLM software from LASCOM S.A.  The system was to integrate directly with the new ERP system from JustFoods, and in doing so, would seamlessly migrate HIF's existing data into the new system.  In addition to overseeing the overall project, Defendant Marasco was directly responsible for implementing the costing and bill of material modules of the ERP system.  Once completed, these modules were to ensure that HIF's unit cost data, financial metrics, and other confidential data were correct, up to date, and available to inform HIF's contract negotiations.

58.     In the year and a half that Defendant Marasco was acting president, HIF regressed resulting in net losses across the company.  Despite being present at the previous daily production meetings, Defendant Marasco dramatically cut production outputs to levels well below the output required to be sustainable, while during other months, arbitrarily increased production well beyond the business need and contracted-for sales.  As business was slowing, rather than cut production days to maintain sustainable production numbers, Defendant Marasco extended the number of days of production by slowing down the line speeds and reducing the output of the factory to unprofitable levels, without reducing labor costs.  Most days, production outputs were half to one-third less than the minimum threshold that Defendant Marasco helped established during the daily production meetings just months before.  Defendant Marasco then cancelled the daily production meetings and withheld the production data from HIF's key managers, including Mr. Schenkel. Then, despite a drop in sales, Defendant Marasco inexplicably and unjustifiably increased production outputs resulting in excess product storage costs and higher than necessary labor costs.  Regardless of whether production was increased or decreased, Defendant Marasco kept the labor force levels the same, resulting in increased labor costs, increased production costs, and negative or razor-thin gross profit margins.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

59.    Defendant Marasco's leadership and direction was appalling to HIF's Director of Manufacturing ("Manufacturing Director"), who helped establish the production output thresholds and the production costs-to-labor costs minimum thresholds.  The Manufacturing Director confronted Defendant Marasco on numerous occasions about his decisions to fluctuate production outputs out of step with the business need and Defendant Marasco's decisions to maintain excessive staffing levels in both emails and during daily production meetings.  Through email, the Manufacturing Director reminded Defendant Marasco of the target outputs and maximum labor costs required to break even.  He suggested that Defendant Marasco lower labor costs by not running production every day.  Instead of heeding the Manufacturing Director's advice, Defendant Marasco dismissed Manufacturing Director's concerns by falsely stating that Mr. Schenkel had approved Defendant Marasco's directions.

60.    At the time, HIF had daily production meetings to evaluate, streamline, and course correct its production operations, output, and schedule.  As profits margins were shrinking and were sometimes even negative, the Manufacturing Director continued to challenge Mr. Marasco's directions to drastically cut production and maintain suboptimal and unnecessary labor costs.  Tired of being confronted and being unable to justify his decisions, Defendant Marasco suddenly and inexplicably cancelled the daily production meetings and withheld the production data from HIF's key managers, including Mr. Schenkel and the Manufacturing Director.

61.    A subsequent internal audit of HIF's financials made clear that Defendant Marasco's mismanagement as described above resulted in waste.

62.    Defendant Marasco was well-informed of the financial impacts of drastically reducing production below the minimum threshold identified many months earlier.  As part of HIF's executive team and the head of the production department, he was an essential part of the previous months' meetings, analysis, and

18

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  decision making that eventually set the production and labor cost thresholds.  He

2  was also contemporaneously being urged by his executive team such as the

3  Manufacturing Director that his actions were unsustainable and deleterious.  Yet,

4  Defendant Marasco inexplicably cut production and/or unjustifiably maintained high

5  labor costs resulting in millions in net losses. .  Defendant Marasco failed to exercise

6  due care and reasonable diligence when he arbitrarily fluctuated production outputs

7  and yet maintained high labor costs , and in doing so, breached his fiduciary duty.

8      63.    Furthermore, Defendant Marasco failed to implement the critical

9  costing module of HIF's enterprise systems.  Rather than integrate the LASCOM

10  software with the new ERP system in order to transfer the crucial costing data,

11  Defendant Marasco unilaterally decided to scrap the LASCOM system altogether

12  despite HIF having already invested hundreds of thousands of dollars into its

13  development.

14      64.    HIF is informed and believes that under Defendant Marasco's

15  leadership, not only was the costing and bill of material module not fully functional,

16  but each costing metric was wildly inaccurate and arbitrary.  As a result, the

17  inventory value of HIF's manufactured items was being reported incorrectly in the

18  ERP system resulting in widely inaccurate financial results.  When Mr. Schenkel

19  asked Defendant Marasco why the inventory values were not correct, Defendant

20  Marasco concealed that he abandoned the LASCOM system which resulted in the

21  bill of material lists being inaccurate.

22      65.    HIF was informed it was overbidding on vendor contracts by one of its

23  customers who told HIF that its ingredient costs were much higher than normal.

24  Instead of taking responsibility or informing Mr. Schenkel of his failure to

25  implement LASCOM, Defendant Marasco reassured Mr. Schenkel by stating that he

26  would investigate the cause and implement a solution.  After Defendant Marasco

27  left HIF, it discovered Defendant Marasco's failure to implement the system and his

28  intentional inputting of arbitrary costs.  HIF's reliance on the ERP system and

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Defendant Marasco's leadership and representations resulted in HIF overbidding and over-ordering on its ingredient purchases, increasing HIF's costs and ingredient waste significantly.

66.     The problem persisted from July 2018 until December 2019.  The problem was finally identified after Defendant Marasco's departure and immediately fixed at great cost to HIF.  In order to investigate the issues Defendant Marasco concealed from HIF management, HIF was forced to bring in an economic forensic professional and two accounting firms to identify and correct these issues. This has cost HIF hundreds of thousands of dollars for these services to date. Additionally, to fix the ERP system and costing/production metrics, targets, and other related benchmarks, HIF has also had to retain a business consultant at further additional costs to HIF.

67.     HIF is informed and believes that these higher ingredient costs hurt HIF's profits as it returned slimmer margins on its products.  HIF is was further harmed as it was unable to secure contracts it would have had it bid on ingredients using its accurate costing data.  Furthermore, HIF lost goodwill as customers complained to it that it was bidding too high on the ingredients going into customers' end products that HIF was producing.  In order to repair its relationships with its customers, HIF had to issue various rebates, credits, and discounts to its contracts resulting in further losses to the business.

68.     HIF is informed and believes that in the year and a half of Defendant Marasco's leadership, HIF sustained in total five million dollars of net general business losses and was operating in the red.  Due to Defendant Marasco's failure to implement the financial module of the ERP system, HIF is still endeavoring to determine the exact amount it lost under his mismanagement.

69.     As a result of Defendant Marasco's failure to exercise his duty of care and perform due diligence as a reasonable president would have in his situation, HIF has had to once again hire an outside financial consultant to help it fix the broken

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  ERP system and bring it back to profitability.

2  **DEFENDANT MARASCO'S ATTEMPTED COUP D'ETAT OF MR.**

3  **SCHENKEL AND ATTEMPTED HOSTILE TAKEOVER OF HIF**

4  70. After Mr. Schenkel returned from his sabbatical, he found HIF in a

5  worse state than when he left. As discussed above, HIF was not performing at the

6  level it needed to, was not turning a profit, and had sustained business losses.

7  Further, HIF's costing and financial enterprise management system was

8  nonoperational and required further time, money, and effort before it would be.

9  71. Despite his mismanagement, Defendant Marasco approached Mr.

10 Schenkel shortly thereafter and demanded that Defendant Marasco be made the

11 permanent president of HIF. Mr. Schenkel disagreed and rebuffed Defendant

12 Marasco's demand.

13 72. This was not the first time that Defendant Marasco had asked to have a

14 larger role in HIF. On numerous prior occasions, Defendant Marasco had asked to

15 be made President or to acquire an ownership interest in HIF. On each occasion,

16 Mr. Schenkel declined Defendant Marasco's requests.

17 73. In the ensuing months after his last ask, Defendant Marasco engaged in

18 a campaign to attempt a coup d'etat of Mr. Schenkel. Defendant Marasco

19 approached other executives and lower level managers and attempted to turn them

20 against Mr. Schenkel. He would tell them that it was actually Mr. Schenkel who

21 was mismanaging the business and that he would do a better job as president of HIF.

22 Maliciously, he even told Mr. Sida and HIF's Vice President of Quality and

23 Technical Services that Mr. Schenkel was taking twelve pills a day and that he was

24 mentally incompetent.

25 74. Further, in an effort to buyout Mr. Schenkel and acquire HIF,

26 Defendant Marasco had attempted to devalue the company and reduce its profit

27 margins. Under this management, Defendant Marasco directed the company to net

28 loss of $5 million dollars and a projected loss of profit of $15 million dollars.

21

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

75.     To accomplish his plan further, Defendant deliberately sabotaged HIF's relationship with one of its customers, Dot Foods ("Dot").  Defendant Marasco was provided proprietary costing formulas and data for transactions with Dot and was tasked with inputting said information into the system.  Instead of inputting Mr. Schenkel's formulas and data, Defendant Marasco inputted his own formulas and data.  This data was arbitrary and was much higher than the costs that HIF had historically contracted for with Dot.  Additionally, Defendant Marasco went a step further and erased the historical data within HIF's data system unnecessarily.  Not coincidentally, based on information and belief, Dot is Defendant Sevillo's largest customer.

76.     In an effort to unseat Mr. Schenkel and gain control of HIF, Defendant Marasco made numerous statements to HIF employees that Defendant Marasco had secured millions of dollars and organized a group of investors who were ready to buy HIF from Mr. Schenkel for fifty million dollars, a value far below the fair market value of HIF before Mr. Schenkel left on sabbatical.  Defendant Marasco had intentionally sabotaged and harmed HIF to drive its value down in order to purchase the company from Mr. Schenkel.

## DEFENDANT MARASCO'S RESIGNATION AND EMPLOYMENT WITH DEFENDANT SEVILLO

77.     After failing to wrest control and ownership of HIF from Mr. Schenkel, Defendant Marasco tendered his resignation on November 19, 2020.

78.     Despite a recent soured history between Defendant Marasco and Mr. Schenkel, HIF still harbored goodwill towards Defendant Marasco.  In his nearly decade long tenure, Defendant Marasco had become a valuable to HIF as he had developed a deep understanding of HIF's operations and its Trade Secrets.  Attempting to retain Defendant Marasco as an employee, HIF kept Defendant Marasco on its payroll and allowed him to be on an extended leave of absence through the beginning of January 2020 in the hopes that Defendant Marasco would

22

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  return and resume his position as Executive Vice President.

2      79.    However, on or around January 28, 2020, Defendant Marasco served

3  HIF with a demand letter in an attempt to extort HIF for a severance agreement

4  under the threat of potential litigation for alleged grievances Defendant Marasco

5  allegedly perceived.

6      80.    Defendant Marasco's demand letter tacitly indicated that he was no

7  longer considering returning to HIF, and as such HIF took Defendant Marasco off of

8  its payroll on or around January 28, 2020.

9      81.    In or around late February, it came to HIF's attention that Defendant

10  Marasco had joined Defendant Sevillo as a member of its Board of Directors.

11      82.    HIF is also informed and believes that Defendant Marasco had

12  relocated to the Greater Salt Lake City Area of Utah.

13  **DEFENDANTS' MISAPPROPRIATION OF HIF'S TRADE SECRETS**

14      83.    In or around late February 2020, one of HIF's largest customers[1]

15  informed it that Defendant Marasco had joined another vegetable-

16  preparation/manufacturing company and that Defendant Marasco and his new

17  employer were soliciting HIF's customer and vendors that serviced that customer's

18  account.  It shortly came to HIF's attention that Defendant Marasco had actually

19  joined Defendant Sevillo as a member of its Board of Directors.

20      84.    Then, on or around March 20, 2020, HIF was informed by its exclusive

21  vendor of a certain raw ingredient that Mary Hessessy, the Business Development

22  Manager of Defendant Sevillo, contacted the vendor inquiring into the same

23  quantities of a particular raw ingredient that HIF purchases from that vendor.  The

24

25  ───────────────

26  [1] Due to the proprietary nature of HIF's customer and vendor lists, the value of
   which is derived from such accounts being secret, HIF is not referring to such
27  entities by their name, nor is it disclosing its informants/contacts at this stage of
   litigation.  Dot Foods is the exception as HIF advertises this relationship on its
28  website.

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,
DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  vendor reported that the transaction struck it as odd and out of place due to the fact

2  that the order was identical in quantity and specification to HIF's contract with the

3  vendor.  Further, the vendor found it odd that Ms. Hessessy was responsible for

4  business development rather being a vendor account manager or specialist.  The

5  vendor asked Ms. Hessessy how she came to know of the vendor, but she was

6  deliberately vague and coy with her statements to not reveal her source.

7      85.    The vendor who Defendant Sevillo courted using HIF's

8  misappropriated Trade Secrets is one of a few suppliers who can deliver the large

9  volume of the raw ingredient used in HIF's multi-million dollar contract with a

10 national restaurant company.  Through many years of trial and error with other

11 vendors, it forged an exclusive relationship with this vendor.  In developing this

12 relationship, HIF spent millions of dollars installing proprietary machines and

13 equipment at the vendor's site in order for the vendor to deliver a product that met

14 the food-grade specifications and standards HIF developed.  This exclusive

15 relationship ensured that HIF could guarantee a consistent supply of an end-product

16 to its national customer at a quality and profit margin that was favorable to both HIF

17 and its customer.  In cultivating this vendor and the other vendors on its vendor list,

18 HIF has been able to maintain and grow its business, profits, and customer goodwill.

19 A direct competitor of HIF ordering the exact amount and specification of this raw

20 ingredient from HIF's same vendor would be highly unlikely—if not impossible—

21 but for misappropriation of its Trade Secrets.  Defendant Marasco had access to this

22 information during his employment at HIF.  Accordingly, HIF is informed and

23 believes that Defendant Marasco has breached his non-disclosure agreement and

24 misappropriated HIF's Trade Secrets.  HIF is also informed and believes that due to

25 Defendant Sevillo and Does 1-25 knowledge that such confidential and proprietary

26 information constituted trade secrets, their use of this information also constituted

27 misappropriation of trade secrets as well.

28      86.    Now, without investing the time and money into researching suitable

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,
DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL

vendors who could deliver the exact specifications required to bid on the multi-million dollar contract with the national restaurant chain, Defendant Sevillo is using HIF's misappropriated Trade Secrets to contract with the otherwise unknown vendor for the exact same quantity, proprietary specifications, and costs that only HIF contracted for.

87.    Defendant Sevillo is further using HIF's Trade Secret information pertaining to its pricing, product formulas, and knowledge about its confidential bid information paired with the Trade Secret information pertaining to this vendor to directly undercut HIF's bids with the national restaurant chain.

88.    On or around August 13, 2020, HIF was informed by its largest customer, the same customer Defendants were targeting by approaching HIF's vendor, that Defendant Sevillo was awarded half of the pickled red onion contract and half of the adobo roasted corn and black bean contract.  These contracts have historically been wholly awarded to HIF after an RFP bidding process because these products were developed specifically for the customer.  Additionally, the pickled red onion contract is HIF's largest contract by volume.

89.    Despite an RFP process, previously no other competitor has been able to match the exact formulas and specifications that the customer has come to expect for its product.  However, now Defendant Sevillo, who does not even list, advertise, or depict these two products on its website, has suddenly been able to clone HIF's proprietary products and win half of the customer's contract.

90.    Clearly, Defendants have misappropriated HIF's formulas in order to secure HIF's customer's business.  First, Defendant Marasco was one of a select few employees at HIF who had access to every one of HIF's secret, confidential, and proprietary formulas and processes.  Shortly after joining Defendant Sevillo, Defendant Sevillo has now been able to win half of contracts for products it never made before.  This is further evident by the fact that Defendant Sevillo makes slow-roasted tomatoes and sauces, but does not advertise anywhere on its website that it

25

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    produces pickled vegetables, let alone pickled red onions, nor does it advertise

2    roasted black beans and corn.  Upon information and belief, these products are

3    outside of Defendant Sevillo's product portfolio and require completely new

4    processes and procedures to produce than its current product offerings.

5         91.    Second, as HIF developed these products specifically for the

6    customer, these formulas, including the onion brine and adobo spice blend, are

7    proprietary and not easily re-creatable.  These product formulas were developed

8    exclusively for the customer after working with it for many years and after spending

9    millions of dollars in research and development and production and packaging

10   equipment. Due to the nature of these end-products, the exact ingredients used in the

11   formulas are not discernable nor able to be reverse-engineered.  For example, HIF

12   uses a proprietary white wine brine consisting of various ingredients at various

13   quantities, but when the final product is created and packaged, the brine takes on

14   qualities from the raw ingredient itself.  Further, in order to maintain the specific

15   properties the customer is looking for, the pickled red onions are packed using a

16   confidential and proprietary packing method, as well.

17        92.    Similarly, the adobo roasted corn and black bean product cannot easily

18   be recreated either.  The adobo spice blend is a proprietary blend created by HIF for

19   the customer.  Without knowing which ingredients and in what proportion to mix

20   each ingredient, it is nearly impossible to recreate a specific spice blend.  It is

21   simply not possible to recreate a spice blend exactly without knowing every

22   ingredient and knowing the proportion of each ingredient.

23        93.    Third, as a large, national restaurant chain, product consistency in

24   quality, presentation, and taste is extremely important to the customer in question.

25   Thus, products such as the pickled red onion and the adobo corn and black beans

26   must match from store to store regardless of where the end product is being sold.

27   As is the case, contracts are awarded to one supplier for each specific product in

28   order for the customer to achieve its desired end product consistency.  The fact that

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

the customer awarded half the contract of both products to Defendant Sevillo means that Defendant Sevillo (suddenly and without any prior experience making these products) was able to create a product that substantially matched the flavor, quality, and visual specification of HIF's offerings such that it could be used interchangeably.  Again, the nature of these products means that this would not otherwise be possible unless Defendant Sevillo had HIF's exact formulas and processes.

94.    As the RFPs for each product did not provide enough specificity for any competitor to create the exact or nearly the exact same product that HIF makes for the customer, HIF is informed and believes that Defendant Marasco and Defendant Sevillo misappropriated HIF's formulas, which comprise, in part, HIF's Trade Secrets in order to steal HIF's business.

95.    HIF is informed and believes that Defendant Marasco disclosed HIF's Trade Secret information to Defendant Sevillo and numerous unknown Doe Defendants who knowingly used this misappropriated information without HIF's consent.

96.    HIF is informed and believes that Defendant Marasco knew or should have known that HIF's vendor and client-related information were Trade Secrets which he acquired through his high-level employment with HIF.  Defendant Marasco also knew or should have known that HIF's proprietary product formulas and processes were Trade Secrets.  Defendant Marasco know or should have known that as a consequence of being given access to these Trade Secrets and his entering into the Marasco Agreement, he had a duty to maintain the secrecy of the Trade Secrets.  In disclosing HIF's Trade Secrets, Defendant Marasco breached the Marasco Agreement and the other agreements he signed with HIF.  Further, HIF is informed and believes that Defendant Marasco understood the value of these Trade Secrets, the advantage of these Trade Secrets, and had intended to misappropriate these Trade Secrets.

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,
DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

97.    HIF is informed and believes Defendant Sevillo and Does 1-25 knew or should have known that HIF's vendor and client-related information were Trade Secrets, as they had derived the Trade Secrets from or through a person who they knew or should have known owed a duty to maintain the secrecy of the Trade Secrets.  Defendant Sevillo, which, upon information and belief, has its own Trade Secrets and confidentiality agreements in place, knew that the information it received from Defendant Marasco were confidential Trade Secrets, yet decided to acquire and use such Trade Secrets without HIF's consent.  HIF is informed and believes that Defendant Does 1-25 were complicit, aided, or affirmatively used HIF's Trade Secrets without its consent as well in furtherance of Defendants Marasco and Sevillo's illegal Trade Secret misappropriation.

## DEFENDANT MARASCO'S SOLICITATION OF HIF CHEF ROBERT LE SAGE AND SOLICITATION OF HIF'S CLIENT

98.    On or around Tuesday, May 12, 2020, HIF Chef Robert Le Sage ("Mr. Le Sage") informed HIF that he was resigning.  That following Thursday, May 14, 2020, Mr. Le Sage tendered his resignation and resigned the following day.

99.    Shortly before Mr. Le Sage's resignation, on May 13, 2020, a Senior Buyer from one of HIF's clients who worked closely with Mr. Le Sage contacted HIF.  The Senior Buyer asked HIF for a list of the inventory and special ingredients that her employer would need to purchase if it were to terminate its contract with HIF.

100.   On information and belief, Defendant Marasco either indirectly or directly solicited Mr. Le Sage to resign from HIF and join Defendant Sevillo.

101.   Further, on information and belief, Defendant Marasco then directly solicited HIF's client by informing the client that Mr. Le Sage was leaving HIF and joining Defendant Sevillo.

102.   Defendant Marasco's actions in soliciting Mr. Le Sage and HIF's client are in direct breach of the Marasco Agreement and other employment agreements

28

LEWIS BRISBOIS BISGAARD & SMITH LLP
ATTORNEYS AT LAW

1    Defendant Marasco signed.

2    **I.**

3    (**Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets**

4    **Act, 18 U.S.C. §§ 1836 et seq.**)

5    **Against Defendants Marasco, Sevillo, and Does 1-25**

6    103.    Plaintiff re-alleges and incorporates by this reference the allegations set

7    forth in Paragraphs 1 through 102.

8    104.    HIF's Trade Secrets alleged above constitute trade secrets under the

9    Defend Trade Secrets Act (18 U.S.C. §§ 1836 et seq.).

10   105.    HIF's Trade Secrets are valuable because they are not generally known

11   or readily ascertainable, through proper means, to others who can profit from the use

12   of the Trade Secrets.

13   106.    HIF has taken more than reasonable measures to maintain the secrecy

14   of the information, including requiring computer access passwords to be used to

15   open HIF computer systems and records, restricting access to its business premises,

16   and having employees, including Defendant Marasco, sign agreements expressly

17   prohibiting the use, removal, and disclosure of such information outside of HIF.

18   107.    The foregoing conduct of Defendants constitute an actual and

19   threatened misappropriation and misuses of HIF's trade secret information in

20   violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq.

21   108.    Defendants' actions with respect to HIF's trade secrets, as alleged

22   above, were a deliberate scheme and plan to deprive HIF of the benefits of HIF's

23   own substantial investment and efforts and steal the fruits of HIF's labor.

24   109.    As a proximate result of Defendants' acts as alleged above, HIF to date

25   has suffered, and will continue to suffer, actual damages, including, but not limited

26   to, loss of capital, loss of valuable business, loss of profits and future profits, and

27   loss of goodwill, in an amount to be proven at trial.  As a further proximate result of

28   the misappropriation, HIF is informed and believes that Defendants have been

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  unjustly enriched as a result the misappropriation of HIF's Trade Secrets.  The

2  amount of this unjust enrichment cannot presently be ascertained.

3      110.   HIF is informed and believes that Defendants continue to possess, use,

4  and disclose HIF's misappropriated Trade Secrets.  Defendants' conduct therefore

5  threatens further wrongful misappropriation, use, disclosure, and destruction of

6  HIF's Trade Secrets.

7      111.   As a proximate result of Defendants' acts as alleged above, HIF will

8  continue to suffer actual damages in an amount to be proven at trial unless

9  Defendants are enjoined from any further misappropriation and use of HIF's Trade

10  Secrets.

11      112.   HIF has no adequate remedy at law for these injuries unless and until

12  Defendants are restrained from using HIF's misappropriated Trade Secrets in the

13  future and ordered to return any such information and property containing HIF's

14  Trade Secrets, because calculations of damages will be difficult and HIF will be

15  compelled to bring multiple suits to protect its interest.  HIF's damages are not

16  easily quantified but include, and are not limited to, lost profits and productivity as a

17  result of damage to its vendor relationships, loss of business due to misappropriation

18  of product formulas, goodwill, disruption of its operations, and time and resources

19  spent investigating Defendants' unlawful conduct, in an amount to be proven at trial.

20      113.   HIF, therefore, is entitled to preliminary and permanent injunctions, as

21  prayed for herein, prohibiting Defendants from further acts of misuses and

22  disclosure of HIF's misappropriated Trade Secrets and ordering Defendants to

23  return such Trade Secrets to HIF immediately.

24      114.   HIF is informed and believes that Defendants' conduct were, and are,

25  malicious, fraudulent, deliberate and willful, as revealed by Defendants' conduct

26  described above.  HIF is therefore entitled to recover from Defendants exemplary

27  damages in the amount twice the total of the damages recovered for actual loss as

28  permitted by 18 U.S.C. § 18369(b)(3)(C).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    115.    HIF is entitled to an award of attorneys' fees pursuant to 18 U.S.C. §
2    1836(b)(3)(D).

3    **II.**

4    (**Misappropriation of Trade Secrets in Violation of the California Uniform**
5    **Trade Secrets Act, Cal. Civ. Code §§ 3426 et seq.**)

6    **Against Defendants Marasco, Sevillo, and Does 1-25**

7    116.    Plaintiff re-alleges and incorporates by this reference the allegations set
8    forth in Paragraphs 1 through 115.

9    117.    HIF's Trade Secrets alleged above constitute trade secrets under the
10   California Uniform Trade Secrets Act, Cal. Civil Code section 3426 et seq. as they
11   derive independent economic value, both actual and potential, from not being
12   generally known to the public or other persons who can obtain economic value from
13   its disclosure or use.  This information is a valuable asset in that it provides HIF a
14   competitive advantage over others.

15   118.    As set forth herein above, HIF has made reasonable efforts to maintain
16   the secrecy of its Trade Secrets through the use of confidentiality agreements and
17   policies, password-secured access to its computer terminals, and by restricting its
18   business premises to employees and those given special clearance.

19   119.    Defendants' actions with respect to HIF's Trade Secrets, as alleged
20   above, were a deliberate scheme and plan to deprive HIF of the benefits of HIF's
21   own substantial investment and efforts to steal the fruit of HIF's labor.

22   120.    As a proximate result of Defendants' acts as alleged above, HIF to date
23   has suffered, and will continue to suffer, actual damages, including, but not limited
24   to, loss of capital, loss of valuable business, loss of profits and future profits, and
25   loss of goodwill, in an amount to be proven at trial.  As a further proximate result of
26   the misappropriation, HIF is informed and believes that Defendants have been
27   unjustly enriched as a result the misappropriation of HIF's Trade Secrets.  The
28   amount of this unjust enrichment cannot presently be ascertained.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

121.   HIF is informed and believes that Defendants continue to possess, use, and disclose HIF's misappropriated Trade Secrets.  Defendants' conduct therefore threatens further wrongful misappropriation, use, disclosure, and destruction of HIF's Trade Secrets.

122.   As a proximate result of Defendants' acts as alleged above, HIF will continue to suffer actual damages in an amount to be proven at trial unless Defendants are enjoined from any further misappropriation and use of HIF's Trade Secrets.

123.   HIF has no adequate remedy at law for these injuries unless and until Defendants are restrained from using HIF's misappropriated Trade Secrets in the future and ordered to return any such information and property containing HIF's Trade Secrets, because calculations of damages will be difficult and HIF will be compelled to bring multiple suits to protect its interest.  HIF's damages are not easily quantified but include, and are not limited to, lost profits and productivity as a result of damage to its vendor relationships, loss of business due to misappropriation of its product formulas, goodwill, disruption of its operations, and time and resources spent investigating Defendants' unlawful conduct, in an amount to be proven at trial.

124.   HIF, therefore, is entitled to preliminary and permanent injunctions, as prayed for herein, prohibiting Defendants from further acts of misuses and disclosure of HIF's misappropriated Trade Secrets and ordering Defendants to return such Trade Secrets to HIF immediately.

125.   HIF is informed and believes that Defendants' conduct were, and are, malicious, fraudulent, deliberate and willful, as revealed by HIF's conduct described above.  HIF is therefore entitled to recover from Defendant exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by California Civil Code section 3426.3.

/ / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

126.   HIF is entitled to an award of attorneys' fees pursuant to California Civil Code section 3426.4.

## III.

### (<u>Breach of Contract</u>)

### Against Defendant Marasco

127.   Plaintiff re-alleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 126.

128.   HIF and Defendant Marasco are parties to the Marasco Agreement.

129.   HIF has performed all of the terms and conditions required of HIF under the Marasco Agreement.

130.   Defendant Marasco's obligations under the Marasco Agreement as to the protection of the HIF's proprietary, confidential, and trade secret information, and agreement not to solicit HIF employees or clients are valid, enforceable, and binding on him.

131.   Despite his contractual agreements, Defendant Marasco materially breached the Marasco Agreement based on the conduct described in the preceding paragraphs by, among other things taking, misusing, transferring, disclosing, and/or otherwise misappropriating HIF's Trade Secrets, soliciting Mr. Le Sage, and soliciting HIF's client.

132.   HIF has been damaged by Defendant Marasco's breach of the Marasco Agreement in an amount to be proven at trial.

133.   Because damages alone may not provide HIF with a complete or adequate remedy, in addition to seeking damages HIF is also entitled to preliminary and permanent injunctive relief prohibiting Defendant Marasco from directly or indirectly breaching the Marasco Agreement.

/ / /

/ / /

/ / /


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

# IV.

## (Intentional Interference With Contract)

## Against Defendant Marasco, Sevillo, and Does 1-25

134.  Plaintiff re-alleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 133.

135.  From the start of his employment to one year after separation from HIF, Defendant Marasco was bound by non-solicitation provisions of the Marasco Agreement.  As discussed above, Defendant was prohibiting or soliciting HIF's employees, including Mr. Le Sage for a one year period after separating from HIF.

136.  However, Defendant Marasco intentionally breached the Marasco Agreement by soliciting Mr. Le Sage which resulted in him leaving HIF.

137.  Prior to joining Defendant Sevillo, Mr. Le Sage was employed with HIF through a valid at-will employment contract.

138.  HIF is informed and believes, and thereon alleges, that Defendants intended to and did interfere with HIF's contract with Mr. Le Sage.

139.  As a direct and proximate result of Defendant Marasco's wrongful conduct, HIF has suffered economic losses, and other general damages, all in an amount to be determined according to proof at the time of trial.

140.  HIF alleges that Defendant Marasco's conduct alleged above were undertaken with the intent to injure, defraud, and permanently deprive HIF of the economic benefit of employing Mr. Le Sage and the use of his considerable skill, or such conduct was performed with a willful and conscious disregard of HIF's rights. Such conduct constitutes clear and convincing evidence of outrageous, oppressive, malicious, and fraudulent conduct that entitled HIF to an award of punitive damages against Defendant in an amount sufficient to deter them from similar conduct in the future.

/ / /

/ / /

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,
DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

## V.

### (<u>Intentional Interference with Prospective Economic Relations</u>)

**Against Defendant Marasco, Sevillo, and Does 1-25**

141.    Plaintiff re-alleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 140.

142.    An at-will employment relationship existed between HIF and its employee Mr. Le Sage.  The continued employment relationship between HIF and Mr. Le Sage would have resulted in an economic benefit to HIF.

143.    By virtue of his former position and duties at HIF, Defendant Marasco was aware of HIF's relationship with Mr. Le Sage, at all relevant times.

144.    HIF is informed and believes, and thereon alleges, that Defendant Marasco intended to and did interfere with HIF's prospective economic relationships with Mr. Le Sage by breaching the non-solicitation provisions of the Marasco Agreement and related employment agreements, in an attempt to gain Mr. Le Sage's considerable experience and expertise in HIF's products and customer base.

145.    HIF is informed and believes and on that basis alleges that the economic relationship between HIF and Mr. Le Sage were interfered with and disrupted by Defendant Marasco.  As a proximate result Defendant Marasco's actions as alleged above, HIF to date has suffered damages in the amount of potential economic benefit to HIF from the future and ongoing employment relationship with Mr. Le Sage.

146.    The aforementioned acts of Defendant Marasco was willful, oppressive, fraudulent, despicable, and in conscious disregard of the rights of HIF, and the resulting harm to HIF.  HIF therefore is entitled to punitive and exemplary damages in an amount according to proof at the time of trial.

/ / /

/ / /

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

# VI.

## (Breach of Fiduciary Duty and Duty of Loyalty)

### Against Defendant Marasco

147.   Plaintiff re-alleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 146.

148.   The elements of a cause of action for breach of a duty of loyalty, by analogy to a claim for breach of fiduciary duty, are as follows: (1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach.  (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 410.)  The duty of loyalty arises not from a contract but from a relationship.  (*Ibid*.)

149.   "The duty of loyalty embraces several subsidiary obligations, including the duty to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors [citation], the duty not to acquire a material benefit from a third party in connection with … actions taken … through the agent's use of the agent's position [citation], and the duty not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party [citation]." (*Huong Que, Inc. v. Luu*, *supra*, at p. 416, internal quotations and citations omitted.)

150.   Defendant Marasco clearly breached his fiduciary duty of loyalty while both the Executive Vice President and de facto President.  By virtue of his roles within HIF, Defendant Marasco owed HIF a fiduciary duty of loyalty to act in the best interest of the company.  Instead, Defendant Marasco breached this duty by conspiring with Defendant Sevillo during his employment with HIF to misappropriate HIF's Trade Secrets.

151.   In or around Early 2019, Defendant Marasco approached Defendant Sevillo at the National Restaurant Convention.  At the convention, he spent considerable time at Defendant Sevillo's booth talking to Defendant Sevillo's

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  executives and representatives.

2      152.   HIF is informed and believes, and on that basis, Defendants started a

3  business relationship, which developed over the ensuing year while Mr. Marasco

4  was still an HIF employee into an agreement whereby Defendant Marasco would be

5  given an ownership interest in and subsequent employment with Defendant Sevillo

6  in exchange for HIF's Trade Secrets.  During his leave of absence, during which he

7  was still being paid by HIF, Defendant Marasco began negotiating and finalizing his

8  employment contract with Defendant Sevillo, again in exchange for disclosure of

9  HIF's Trade Secrets.

10      153.   On information and belief, and alleged thereon, Defendant Marasco as

11  de-facto President also intentionally sabotaged HIF's business relationship with Dot

12  by destroying the customer costing data.  This was done to cause HIF to lose market

13  share with Dot, while allowing Defendant Sevillo's to increase its market share with

14  Dot.  It is believed that Defendant Marasco did this in order to devalue HIF in order

15  to orchestrate a hostile takeover, and also to benefit Defendant Sevillo.

16      154.   Defendant Marasco intentionally and knowingly breached his fiduciary

17  duty and duty of loyalty owed to HIF by engaging in the conduct alleged above, by

18  intentionally helping Defendant Sevillo compete with HIF, and, in particular, by

19  misappropriating HIF's Trade Secrets for Defendants' benefit.  As a direct and

20  proximate result of Defendant Marasco's breach of his fiduciary duty and duty of

21  loyalty to HIF, HIF to date has suffered and will continue to suffer unless Defendant

22  Marasco is enjoined from misappropriating HIF's Trade Secrets, and other

23  confidential and/or proprietary trade secrets.

24      155.   HIF has no adequate remedy at law for these injuries unless and until

25  Defendant Marasco is restrained from engaging in the wrongful acts described

26  above in the future because calculations of damages will be difficult and HIF will be

27  compelled to bring multiple suits to protect its interest.  HIF's damages are not

28  easily quantified but include, and are not limited to, HIF's lost profits or advantages

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    on any of Defendants' improper dealings in an amount to be proven at trial.  Further,

2    HIF is entitled to preliminary and permanent injunctions as prayed herein

3    prohibiting Defendant Marasco from engaging in future and further acts for misuse

4    and misappropriation of HIF's Trade Secrets and confidential information, as

5    alleged herein.

6        156.    In committing the breach of fiduciary duties as described above,

7    Defendant Marasco is guilty of malice and oppression in that he secretly

8    misappropriated HIF's Trade Secrets and confidential and/or proprietary

9    information while still employed with and/or drawing a paycheck from HIF.

10   Further, Defendant Marasco is guilty of malice and oppression in that he

11   misappropriated such information for the purposes of allowing Defendant Sevillo to

12   compete with HIF, when it was not otherwise doing so already.  In doing the acts

13   alleged above, Defendant Marasco has acted with conscious disregard for HIF's

14   rights and his own duties to HIF, thereby warranting an award of punitive damages,

15   in an amount appropriate to punish Defendant Marasco and deter others from similar

16   misconduct.

**VII.**

**(Breach of Fiduciary Duty and Duty of Care)**

**Against Defendant Marasco**

20       157.    Plaintiff re-alleges and incorporates by this reference the allegations set

21   forth in Paragraphs 1 through 156.

22       158.    As Executive Vice President at HIF, Defendant Marasco owed HIF a

23   fiduciary duty and duty of care for the utmost interest of HIF.  As part of his duty of

24   care, Defendant Marasco was to refrain from any act, or omission to act, that was

25   calculated or likely to injure or harm HIF.

26       159.    As alleged above, Defendant was charged with running and operating

27   HIF after its owner and president took a leave of sabbatical.

28       160.    While managing HIF, Defendant Marasco drastically and arbitrarily set

LEWIS BRISBOIS BISGAARD & SMITH LLP
ATTORNEYS AT LAW

1    production levels without taking the respective action as to the labor costs.  As

2    alleged above, Plaintiff Marasco maintained high labor costs regardless of the actual

3    labor need and effect on profit margins.  This resulted in extremely narrow and even

4    negative profit margins on HIF's products.

5        161.   Further, despite being warned about the deleterious effects of his

6    arbitrary and unjustified decisions regarding HIF's production operations,

7    Defendant Marasco either simply ignored such advice, cancelled production

8    meetings, and outright lied to other executives to cover up his mismanagement.

9        162.   Defendant Marasco further failed to exercise his duty of care as

10   expected of a president or corporate office in the same or similar circumstances in

11   the implementation of the ERP costing module.  Rather than connect the ERP

12   system to the new LASCOM system for a seamless data transfer, HIF is informed

13   and believes that Defendant Marasco unilaterally decided against implementing the

14   system.  As a result, using the new ERP system which did not contain the correct

15   costing data, HIF was overbidding on contracts and suffered economic losses as

16   alleged above.

17       163.   Defendant Marasco failed to exercise his duty of care as would an

18   President or Executive Vice President would do under the same or similar

19   circumstances.

20       164.   As a direct and proximate result of Defendant Marasco's breach of

21   fiduciary duty, HIF to date has suffered and continues to suffer actual damages in an

22   amount to be proven at trial.

23                          **PRAYER FOR RELIEF**

24       WHEREFORE, for the wrongful acts of Defendants complained of in the

25   foregoing causes of action, Plaintiff respectfully requests the following relief:

26       A.     Judgement in Plaintiff's favor and against all Defendants;

27       B.     Preliminary and permanent injunctive relief, including a preliminary

28   injunction, prohibiting Defendants from:

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1          a.      any further possession, disclosure, and/or use of Plaintiff's Trade

2   Secrets, confidential, and/or proprietary information;

3          b.      revealing or disclosing HIF's Trade Secrets, any confidential

4   information, and/or proprietary information to any person or entity for any reason or

5   purpose whatsoever, or making use of such information for Defendants' benefit or

6   for the benefit of any other person or entity;

7          c.      engaging in unlawful, unfair, and fraudulent business practices

8   including intentional interference with HIF's business relationships and contracts

9   with its vendors; and

10         d.      profiting or benefiting from their wrongful conduct;

11   C.      An order that Defendants return any and all confidential and/or trade

12   secret information of Plaintiff, and an order prohibiting any further use or benefit

13   from the use of said information;

14   D.      An order that Defendants inform HIF and the Court of all vendors and

15   clients of HIF that Defendants contacted using HIF's Trade Secrets;

16   E.      An award of general, special, consequential, and compensatory

17   damages to Plaintiff in an amount to be determined at a hearing and/or trial

18   including, but not limited to, all amounts Defendants received for contracts or

19   business transactions they entered into, solicited, procured, or negotiated while

20   using, utilizing, referencing or relying on HIF's Trade Secrets, as well as attorneys'

21   fees and costs;

22   F.      An award of general, special, consequential, and compensatory

23   damages to Plaintiff in an amount to be determined at a hearing and/or trial

24   including, but not limited to, all amounts HIF suffered in business losses, consultant

25   fees, and other costs and fees associated with Defendant's mismanagement of HIF

26   in the amount of $6,000,000 or more, as determined at trial, as well as attorneys'

27   fees and costs;

28   / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,
DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL

G.    An order directing Defendants to disgorge all gross revenues and profits that they or anyone acting in concert or participation with them received as a result of their wrongful conduct, in an amount to be determined at trial;

H.    An award in favor of Plaintiff for its costs associated with this action, including without limitation their attorneys' fees pursuant to the common law, the Defend Trade Secrets Act, and the California Uniform Trade Secrets Act;

I.    An award of exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by 18 U.S.C. § 1836(b)(3)(C) and by California Civil Code § 3426.3;

J.    An award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and California Civil Code § 3426.4;

K.    Compensation to Plaintiff for any unjust enrichment enjoyed by Defendants, including restitution of all revenues, gains, profits, and advantages obtained by Defendants as a result of their wrongful and unlawful conduct, in an amount to be determined at a hearing and/or trial;

L.    An award of pre-judgment and post-judgment interest as permitted by law;

M.    An order imposing a constructive trust;

N.    An order that Defendant Marasco complies with the Marasco Agreement;

O.    Declaratory relief against Defendant Marasco with regards to his breaches of fiduciary duty to HIF;

P.    Any such other legal and equitable relief as the Court deems appropriate.

/ / /

/ / /

/ / /

/ / /



FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,
DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL

1

**DEMAND FOR JURY TRIAL**

2

Plaintiff demands trial by jury to the fullest extent as allowed by law.

3

4

DATED: September 4, 2020          JOHN S. POULOS

5                                 KATHERINE C. DEN BLEYKER

6                                 OMAR M. ANIFF
                                  LEWIS BRISBOIS BISGAARD & SMITH LLP

7

8

9                                 By:   /s/ Omar M. Aniff

10                                      Katherine C. Den Bleyker
                                        Omar M. Aniff
11                                      Attorneys for HALIBURTON
                                        INTERNATIONAL FOODS, INC.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,
DECLARATORY RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL